IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

DEC 21 2016

Clerk, U.S. District Court
District of Montana
Missoula

| | |
|---|---|
| TROY McGARVEY, | Cause No. CV 14-201-M-DLC |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| VANCE LAUGHLIN; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

## I. Introduction

A jury found Troy McGarvey guilty on two counts of deliberate homicide in connection with the shooting deaths of Clifford Grant and Norman Nelson. McGarvey is serving two concurrent sentences of 100 years each for the homicides, plus two ten-year terms for use of a dangerous weapon in each homicide, consecutive to the homicide sentences but concurrent to each other, for a total imprisonment term of 110 years.

McGarvey appealed his convictions. On December 6, 2005, the Montana Supreme Court affirmed the trial court's judgment. *State v. McGarvey*, 329 Mont. 439, 124 P. 3d 1131 (2005). McGarvey also pursued post-conviction relief. When the trial court denied his petition, he again appealed to the Montana Supreme Court. On July 15, 2014, that court affirmed the trial court's denial of relief.

1

*McGarvey v. State*, 2014 MT 189, 375 Mont. 495, 329 P. 3d 576.

On July 18, 2014, McGarvey filed the instant federal petition for writ of habeas corpus. McGarvey raises three general claims for relief: (1) the state failed to disclose exculpatory evidence in violation of McGarvey's due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963); (2) McGarvey's trial counsel were ineffective, and (3) taken together, these violations constitute cumulative error.

On October 3, 2014, Respondents filed an answer to the petition. Petitioner responded to the answer on November 14, 2014. For the reasons discussed, it is recommended that McGarvey's petition be denied on the merits.

## II. Background

The issues in McGarvey's habeas petition center on what the State and what defense counsel knew before trial. The jury, of course, decided the case based solely on the testimony and evidence presented at trial. But to understand McGarvey's claims, it is helpful to reconstruct the investigation and trial testimony chronologically. At the same time, it is important to identify information that was not disclosed to the defense or presented to the jury at trial.

The Court has attempted to lay out the chronology and also identify what was withheld in the following sections. Except where otherwise indicated, and except in the sections labeled "undisclosed" or "unknown," the following facts were uncontested at trial, although some were contested in postconviction

proceedings.

## A. The Investigation

At the time of the murders, McGarvey resided on Harmony Road in Kalispell, Montana, with his wife Gena and her son, Kelsey Nichols. Stan Edwardson rented a garage on McGarvey's property and worked on cars there. Behind Edwardson's garage, also on McGarvey's property, Robert Armstrong lived in a small trailer and occasionally helped Edwardson with car repairs. Another man, Rod Monroe, also occasionally worked at the garage. Drugs and alcohol were prominent factors in the communal life.

In another community, Ferndale, about thirty minutes away, Clifford Grant lived on a twenty-acre, heavily wooded parcel of land sloping downward from the entrance off Highway 209. Grant and McGarvey were cousins, but were not particularly close. Grant's house was a trailer with an addition on one side. The entrance faced west, toward the Swan River, which bounded the property on the west side. Norman Nelson had lived on Grant's property for a few months in another trailer a short distance from Grant's home.

Grant's property was entirely fenced for privacy reasons. He also had a gate at the entrance to the property and another gate at the entrance to the curtilage of his residence. The outer gate, at least, was usually locked. Grant posted no-trespassing signs, motion detectors, and security lights throughout the property. He

generally required friends to call him before they came over and he was usually armed. Grant, who illegally grew marijuana, kept 56 pit bulls on the property.[1]  A person standing at the entry gate could see very little on the property.

### 1. The Bodies Are Discovered

On July 12, 2001, a friend of Grant's, Dallas Koepfli, became concerned enough about his inability to contact Grant to enter the property and look for him. He started toward Grant's house but, before he got to the residence gate, he saw Nelson in his car, dead. Koepfli was frightened and left. He did not want to be the one to call the police, so he called Grant's brother-in-law, Ken Mack, and told him he was concerned about Grant. Mack entered the property and waited in front of Grant's residence, expecting Grant to hear the dogs barking and come out to see who was there. No one came out. When Mack turned to head back up to the road, he saw Nelson's car with someone in it. Mack walked over to the vehicle and realized Nelson was dead. Mack called the police.

Law enforcement found Nelson in a half-sitting, half-kneeling position in the driver's seat with his right arm and head hanging over the headrest and back of the

---

[1] One witness testified:
    Q.    And these dogs were mean?
    A.    I guess.
    Q.    Well, you know they were, don't you?
    A.    I don't know.
    Q.    Would you go up and pet one?
    A.    Hell no.
(Doc. 10-4 at 480:17-22).

4

seat. The doors of the car were closed, but the windows were down. Nelson had been shot twice. Both bullets were found in the car. One wound began at the middle of the area below the lower lip and ran across the left jaw. The other ran from the left temple area through the head to the right parietal area. Neither wound showed any stippling or traces of powder. Nelson's blood contained traces only of caffeine and nicotine. There were no weapons and no keys in the car.

Grant was found lying on his back at the west entrance to his residence. His body had been there for some time, exposed to insects, birds, small animals, and some of the dogs. His face was severely disfigured. Grant had at least two gunshot wounds to the head, one beginning just in front of his right ear and going back into his skull and brain, and one beginning a few inches below his left ear and going forward through his lower jaw and tongue. There could have been another shot to his head, particularly in the area of his chin, but it was impossible to tell. A third gunshot wound began at his left elbow and entered his left lower chest wall, going through a rib, his spleen, a kidney, and his aorta, and ending in his right abdominal cavity. The entry wound at the right ear showed no traces of powder or stippling, but the left-ear wound and the abdominal wound appeared to be inflicted from less than one to two feet away. Grant's blood showed traces of marijuana, nicotine, and methamphetamine.

Only three fragments of bullets were found. Both men were killed by bullets

suitable for use in a .38 or .357 firearm. There were no ejected shells, indicating use of a revolver. Although the bullets all appeared to be the same type, the two men together suffered at least five and possibly six wounds. In addition, Nelson's wounds could have been inflicted from two different directions. It was possible, therefore, that more than one gun had been used, and/or that more than one shooter was involved, but it was also possible that one shooter used one gun. No gun was found at the scene. No gun was ever identified as a murder weapon. Entomological evidence indicated both men were killed on July 10, 2001, two days before their bodies were found. Grant could have been killed at the same time or as much as a few hours before Nelson.

## 2. Grant's Home Is Searched

When Grant's home was searched, officers found an answering machine with 42 recorded messages on it.[2] At 10:36 a.m. on July 10, 2001, McGarvey had called. At 12:20 p.m. the same day, Tony Sanchez left a message saying that he was outside to pick up jet skis and a truck that Grant let him store on the property. Sanchez asked Grant to come out and said he was with Nelson, trying to jump-start his pickup. On the same message, McGarvey spoke. After that message, other people called as well, until eventually the tape ran out. Before it ran out, Sanchez

---

[2] Some of the recorded messages were played for the jury at trial but not reported or transcribed by the court reporter. The Court's understanding of the messages' contents is derived from other witness testimony.

left several more messages, asking Grant where he was and telling him to call. McGarvey left none.

Inside Grant's residence, officers found numerous firearms and accoutrements, including two black carrying cases for Dan Wesson .357 magnum revolvers and a box of .357 ammunition. The bullets in the box had a rounded shape at their base. The box could contain a total of 50 bullets. Six were missing.

Grant's father testified that he purchased two Dan Wesson .357 revolvers years before and saw the one with the longer barrel when he last visited Grant in January 2000. In Nelson's residence, officers found the shorter-barreled Dan Wesson, fully loaded. Its bullets did not have a rounded shape at the base like the bullets in the box of ammunition. Forensic testing showed the bullet fragments found at the scene were not fired from Nelson's Dan Wesson revolver but could have been fired from a Dan Wesson .357. Officers never found the longer-barreled Dan Wesson .357. The bullet fragments found with Grant's and Nelson's bodies had rounded bases.

Some distance away from Grant's residence, but still on Grant's property, officers found another trailer residence that had been occupied by Louis Rodriguez. There was evidence there of a separate, defunct marijuana-growing operation and a speed boat and other property of value that Rodriguez never reclaimed.

### 3. McGarvey's Statements to His Friends

According to some of the testimony at trial, two people, Robert Armstrong and Stan Edwardson, heard McGarvey make self-incriminating statements at a gathering on the McGarvey property, before news of the killings broke.

Armstrong, who had accompanied McGarvey on a prior visit to see Grant, testified as follows. McGarvey said something happened at Grant's house. McGarvey thought he might have to leave town for a while and would send for Gena and his step-son Kelsey Nichols. In addition, again according to Armstrong, later the same day McGarvey said he and Grant were talking when Grant "flipped out" and pulled a gun on him. McGarvey described a struggle in which he fell to the ground with Grant on top of him. Grant fired two rounds, one on each side of McGarvey's head, and then McGarvey was able to wrest the gun away from him. McGarvey said he shot Grant a few times. McGarvey then pursued Nelson, believing he was going to retrieve a shotgun from his car. McGarvey shot him more than once. McGarvey said Grant's body was in front of the door; Armstrong assumed he meant the door on the west side of the residence. McGarvey also said he threw the gun in the river.

Edwardson stated that McGarvey "started asking me if I thought he was a good guy." McGarvey then said he had shot two people in Ferndale, one of whom was his cousin. One of the two victims was shot in front of the house, and the other

was in his car. Edwardson said the gun was a .357 and believed the first victim was lying on his back on the ground near the door to his home. Edwardson did not recall McGarvey using the individuals' names and had never been to Grant's property. Grant's posture on the ground, his location, and the caliber of the firearm likely used were not revealed in any news coverage.

When news of the killings broke, neither Edwardson nor Armstrong went to the police. Rumors circulated, and initially-promising investigative leads died out. Several people acquainted with Grant or Nelson, including the chief of detectives, suggested the "Mexican mafia" might be involved. Grant's sister pointed out that much of the "Mexican mafia" rumor seemed to come from Dallas Koepfli, but he, along with some of the other people interviewed, proved to be untruthful. Another rumor involved Tyson Christianson giving a check to someone who in turn gave it to Grant or Nelson, and when the check bounced, the unidentified people were angry and responded with violence. There was also a rumor that a .22 pistol possessed by Andy Wingner was involved in the homicides, but none of the evidence at the scene suggested the use of a .22.

### 4. McGarvey and Sanchez

Detectives interviewed McGarvey a few weeks after the murders. McGarvey had left several messages on Grant's answering machine before July 10 concerning a bounced check and payment for McGarvey's work clearing brush on Grant's

property the previous winter. McGarvey told the detectives he phoned Grant from the Ferndale Market, just across the river from Grant's place, but there was no answer. Then he went to Grant's property. He had been waiting there at the gate for five or ten minutes when two Hispanic men arrived in a vehicle with Washington plates. McGarvey said he spoke briefly with them and one of the men – Sanchez, according to the answering machine tape – called Grant on the phone. McGarvey said he left as the two Hispanic men remained at the gate.

Although officers were interested in a possible drug-related motivation for the killings, they could not initially find Sanchez. Grant's family, however, reported that Grant and Sanchez were friends and Sanchez had lived on Grant's property for a time in 1999. They did not recall Grant saying that he owed Sanchez money or vice versa or saying anything bad about Sanchez. To all appearances, the two were good friends.

### 5. The Crime Stoppers' Tip and Armstrong's Arrest

On July 21, 2001, police received a Crime Stopper's tip from an anonymous woman who said that a man named Tony or Troy, living on Harmony Road, had murdered his cousin.

On October 4, 2002, Armstrong was arrested on a felony DUI charge. In a bid for leniency on that charge, Armstrong told police what he overheard during the July gathering at McGarvey's. See, (Doc. 10-19 at 5-21). Armstrong admitted

he was "half-lit" when he heard McGarvey's story, but he said Gena McGarvey and Stan Edwardson heard it as well. Armstrong added that he had told his mother what he heard several days afterward, hoping it would convince her to find him another place to live. Armstrong obtained the leniency he sought on the felony charge. He also asked about the Crime Stopper's reward money. *Id.* at 30-31. Armstrong's mother, Susan Fox, initially denied that she was the person who called the Crime Stopper's hotline, but after she talked to Armstrong, she admitted she was the anonymous caller.

Following Armstrong's initial statement implicating McGarvey, he wove multiple alternative versions, placing different people at the scene of the confession and adding and forgetting various details.[3] In addition, Armstrong was in and out of jail, fled the State twice, and made exaggerated claims about his personal drug use at his own revocation hearing. He proved himself to be driven by self-interest and perfectly willing to lie. Armstrong claimed McGarvey lost or stole $3,900 in property from him, and he wrote a letter to McGarvey while McGarvey was incarcerated, insinuating that he would not testify against McGarvey if he was paid the money. (Doc. 10-21 at 66).

Armstrong's statements led police to Nichols and Edwardson. Nichols

---

[3] For example, compare (Doc. 10-19 at 55-56)(Armstrong indicates Gena McGarvey overheard the confession and/or knew about the homicides and that to his knowledge Edwardson knew nothing of the confession) with (Doc. 10-19 at 69-70)(Armstrong denies Monroe, Edwardson, Gena McGarvey, or Kelsey Nichols were present for the confession) with (Doc. 10-19 at 162-179)(Armstrong indicates Monroe was present for McGarvey's confession).

denied hearing McGarvey say anything about killing two people in Ferndale or about going to Alaska, but he recalled the barbeque gathering, and he agreed that McGarvey kept asking Edwardson whether Edwardson thought McGarvey was "a nice person." (Doc. 10-18 at 114).

### 6. Edwardson Is Interviewed

In a long interview in January 2002, Edwardson agreed with much of Armstrong's account of the gathering at McGarvey's house, but he would not say he heard McGarvey confess to killing anyone. See generally, (Doc. 10-19 at 73-123). He returned to the police station a few days later. He then explained that he had talked to his sister, and she convinced him he should do the right thing by coming forward and telling them what he knew. (Doc. 10-19 at 137). He also talked to another individual, Rod Monroe, between the interviews. *Id.* Edwardson then told the police what he heard McGarvey say in July of 2001. *Id.* at 124-139.

### 7. Sanchez Is Found and Interviewed

On February 5, 2002, detectives made contact with Sanchez on his cell phone. (Doc. 10-18 at 35-48). He said he was at home in Yakima, Washington, while in reality he was in the Flathead Valley dealing drugs. During the phone call, Sanchez was advised by the detectives he was not a suspect in the murders. *Id.* at 36, 41-42, and 45. The following day, Sanchez was arrested on drug charges in Lake County, Montana.

On February 7, 2002, Flathead County detectives Stahlberg and Parish traveled to the Lake County Detention Facility to interview Sanchez. The interview began with detectives assuring Sanchez they knew who was responsible for Grant's murder. They again advised Sanchez he was not a suspect and said they had ruled out the "Mexican mafia" theory. It was made clear to Sanchez that the detectives believed Troy McGarvey was responsible for the homicides. The detectives did not ask Sanchez whether he had been dealing drugs to Grant. See e.g., (Doc. 10-4 at 196- 199).

### 8. Other Evidence of Sanchez's Drug Activity

#### a. Known to Flathead County Detectives

The same day Flathead County detectives interviewed Sanchez they also interviewed a woman named Mary Leptich, although there is no record or recording of their interview. The entire encounter, including the time it took to transport Leptich from her cell to the interview room, lasted seventeen minutes. (Doc. 10-18 at 49).

#### b. Unknown to Flathead County Detectives

Leptich was also interviewed by Lake County detectives who were pursuing the drug distribution case against Sanchez. She advised them that she had no personal knowledge of Sanchez being involved in the homicides and that she had not heard anything regarding the homicides through the grapevine, but she did

have a hunch he was somehow involved. (Doc. 10-22 at 124-50). Leptich also told Lake County detectives and the Northwest Drug Task Force that she was very familiar with Sanchez's drug dealing. (Doc. 10-22 at 155- 164; Doc. 10-23 at 1-30). She stated that she had personally dealt drugs for Sanchez for four years and that she dealt approximately two ounces of methamphetamine each month. She disclosed that Sanchez had brought in two pounds of meth to Montana each month for years. The task force estimated this value to be between $600,000 and 2.1 million dollars, and between 30 and 108 pounds over the course of his dealings in the Flathead area. Leptich was afraid of Sanchez and knew he had "enforcers" to collect his debts. (Doc. 10-23 at 8-10). She also was aware that Sanchez collected drug money along with his nephew.

Approximately seven pages of the Leptich interview are redacted. The Court does not know what they contain. No one has advised the Court whether the redacted material has ever been provided to McGarvey's counsel or to Flathead County detectives. The disclosures Leptich made regarding the scope of Sanchez's drug activity were not disclosed to McGarvey until the postconviction proceedings were underway.

These same reports, obtained from the task force and from the St. Ignatius Police Department, also had information that Sanchez threatened to kill a woman, Ann Marie Opal Matts. And although it was never proven, it was also widely

believed that Sanchez was responsible for violently beating a man named Barney Salois who apparently owed Sanchez money. (Doc. 10-23 at 46).[4]

### 9. Edwardson's and Monroe's Drug Activity in 2002

#### a. Disclosed

In August of 2002, Edwardson was implicated during an investigation into drug-related activity. On August 19, 2002, Edwardson was charged via complaint with operating an unlawful clandestine laboratory between July 8 and August 8, 2002. (Doc. 10-19 at 155). Edwardson plead guilty to the charge on January 30, 2003. (Doc. 10-19 at 158-9). At the time of McGarvey's trial, the defense team was well aware of Edwardson's methamphetamine-related conviction.

#### b. Undisclosed

Apparently, Edwardson's girlfriend, Kim Kirsch, purchased two gallons of iodine used in the methamphetamine cook sometime in the spring of 2002 at the behest of Edwardson's friend, Rod Monroe, who was incarcerated at the time. Following his release, Monroe, Kirsch, Edwardson, and others were engaged in the production of methamphetamine.

Monroe was also charged in conjunction with this operation, however, it does not appear that the fact that Monroe was also charged ever was conveyed

---

[4] This information was unknown to either the State or defense counsel until McGarvey's postconviction proceedings. The State maintained it was not made aware of the allegation against Sanchez of beating Barney Salois or of Leptich and the information she provided to Lake County detectives. (Doc. 10-23 at 127-88, ¶¶ 2- 3).

directly to McGarvey's defense team.[5]

Despite not knowing about the connection between Edwardson and Monroe and their illicit methamphetamine related activities, McGarvey's defense counsel did know that, between his initial statement on January 4, 2002, denying first-hand knowledge of McGarvey's confession and his subsequent statement given days later wherein he disclosed that he had, in fact, heard McGarvey confess, Edwardson paid a visit to Monroe who was then incarcerated. Monroe asked Edwardson to tell investigators that he was also present for McGarvey's confession. (Doc. 10-19 at 137-138). Monroe hoped to gain leniency on his criminal charges in the same manner as Armstrong had.

### 10. Armstrong's Mental State

#### a. Disclosed

In January of 2002, Armstrong was arrested in Lincoln County, Nevada, after jumping bail. He was subsequently returned to Montana on January 31, 2002. From that time through McGarvey's trial, he was held in custody. While in custody, he wrote a copious amount of notes, many of which were nonsensical and incoherent. (Doc. 10-21 at 66-150). The State told McGarvey's counsel about the notes.

---

[5] McGarvey's defense team was unaware of Edwardson and Monroe manufacturing methamphetamine together. (Doc. 10-23 at 104). They believed a supplemental discovery motion filed on June 27, 2003, would have encompassed information pertaining to Edwardson and Monroe's illegal activities. *Id.*

### b. Undisclosed

Armstrong was set to be sentenced on August 7, 2003 for theft and violation of the conditions of his supervision. Susan Fox, his mother, wrote a letter to the sentencing judge. (Doc. 10-21 at 64-5; Doc. 10-19 at 185-6). She also testified at Armstrong's sentencing hearing. Although the State provided McGarvey a transcript of Armstrong's June 26, 2003, change of plea hearing, the State did not disclose a transcript of Armstrong's sentencing hearing during which Fox testified, or a copy of the letter that Fox sent to the trial court prior to sentencing.

The sentencing hearing was held on August 7, 2003. Fox's letter was dated August 4, 2003, and was copied to Armstrong's attorney, the County Attorney, and the Probation Department. The letter contained the following passage:

> My point is that [Armstrong] is being treated as a capable adult with normal mental capacity and he is not. His actions fit the classical pattern of an electrocution victim- Forgetfulness and then an inability to handle even mildly stressful situations, i.e.- Fleeing after a mix-up on a court date.

(Doc. 10-19 at 185).

At Armstrong's sentencing hearing, Fox testified that due to an electrocution that occurred in 1993, she noticed changes in Armstrong's behavior which included: an inability to cope with stress, forgetfulness, a disrupted sleep pattern, and confusion. Fox also stated that Armstrong's short term memory seemed to be affected, that he sometimes had erratic thoughts, and that he could be "very impulsive." (Doc. 10-21 at 32-35).

17

Although McGarvey's counsel knew of Armstrong's sentencing, they made no further inquiry about it once they knew Armstrong was not getting the benefit of a plea offer. Despite his attorney's advice to the contrary, Armstrong elected to enter an open plea.

**B. The Trial**

At the trial on November 10-14, 2003, the State primarily relied upon testimony from Armstrong and Edwardson regarding McGarvey's confession. Sanchez, Fox, and others were called in the State's case in chief. The pertinent testimony will be discussed herein where applicable.

Troy McGarvey testified in his own defense. The defense did not call Gena McGarvey or Kelsey Nichols in its case in chief. As set forth above, McGarvey was convicted of both counts of homicide. His conviction was upheld on direct appeal. *State v. McGarvey*, 329 Mont. 439, 124 P. 3d 1131 (2005).

**C. The Postconviction Investigation**

McGarvey retained new counsel and an investigator to represent him in his postconviction proceedings. In preparing McGarvey's postconviction petition, the following information was uncovered.

**1. Kenneth Gifford**

Despite not personally knowing McGarvey, in March of 2004, Kenneth Gifford wrote a letter to him after speaking with a mutual incarcerated

acquaintance. (Doc. 10-18 at 59). Gifford's letter stated he had spent time with a man named "Junior," who was a Mexican-American, whom Gifford believed to be from Washington state. Junior disclosed to Gifford that Grant was murdered over a $25,000 drug debt which Grant owed to Junior's family. Junior asked Gifford if he wanted to go to the property to look for money he believed had been left on the property. Junior advised that he had taken over the drug trade from his uncle who had been arrested. The conversation likely happened in late 2003. Gifford testified at the postconviction hearing. See, (Doc. 10-24 at 181- 186).

### 2. Joseph Buck

Joseph Buck, who was incarcerated with Armstrong in 2002, testified Armstrong told him that after learning of the homicides from McGarvey, he and another individual went to Grant's property. (Doc. 10-24 at 171). Armstrong put plastic bags over his feet, and attempted to access the property via the riverbank in search of drugs and money he believed had been left there. *Id.* Although Buck did speak with one of McGarvey's attorneys prior to trial, he did not tell the attorney about Armstrong's exploits. *Id.* at 172. Buck was also in custody for a time with McGarvey and relayed this same information to McGarvey prior to McGarvey's trial. *Id.* at 173.

### 3. Gene Holford

Gene Holford stated that he knew Grant through a mutual acquaintance,

George Crew, and had attempted to buy a pitbull puppy from Grant. (Doc. 10-24 at 238). When Holford went to pick up the puppy, Grant refused to sell it to him. Holford returned to the property with Crew in tow and upon arrival they encountered a neatly dressed Hispanic man in a nice car. *Id*. at 240. The man did not speak English well, but Holford testified he heard the man say Grant owed him $25,000. *Id*. at 241-42.

### 4. Mary Leptich

The information set out above at pages 13-15, under the heading "Unknown to Flathead County Detectives" was apparently not known by either the Flathead County Attorney's Office or by McGarvey's team until the postconviction investigation and proceedings were undertaken. Flathead County detectives briefly interviewed Leptich on February 2, 2002, when they came to interview Tony Sanchez following his arrest, although no report or written record was made of the interview. Mary Leptich was debriefed by the Northwest Drug Task Force and the information she possessed regarding Tony Sanchez's drug dealing was known to that agency, but the information did not find its way to McGarvey's trial counsel.

McGarvey's investigator, Mark Fullerton, became interested in Leptich when he accessed Sanchez's criminal file from the Clerk of District Court in the Lake County Courthouse. (Doc. 10-25 at 137). He saw that Leptich and Sanchez were charged in 2002 as co-defendants in a drug distribution case. From there he

located Leptich via the Montana Department of Corrections Correctional Offender Network Search and interviewed her on August 28, 2006. *Id*. This interview led him to make additional contacts in Lake County.

### D. The Postconviction Hearing

In April of 2011, a two day hearing was held on McGarvey's petition for postconviction relief. At the hearing Greg Jackson and Don Vernay, McGarvey's trial counsel, both testified, along with law enforcement officers who investigated the original case and private investigator Fullerton. Joseph Buck, Kenneth Gifford, and Gene Holford all testified, as did Kelsey Nichols, McGarvey's step son. In addition, McGarvey presented testimony from Kay Sweeny, a forensic expert. The State called Montana State Medical Examiner, Dr. Gary Dale, and blood spatter expert, William Schneck.

On December 31, 2012, the trial court denied McGarvey's petition for postcoviction relief. (Doc. 10-26). The Montana Supreme Court affirmed the denial. *McGarvey v. State*, 2014 MT 189, 375 Mont. 495, 329 P. 3d 576.

### III. Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after the Act's effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). The instant petition is governed by the AEDPA.

Under the AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. at 375 n. 7 (2000). Under Section 2254(d), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See also *Harrington v. Richter*, 526 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002)(quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," where the

state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the Petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' ...and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010). The standard is " 'difficult to meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

## IV. Review of Petition

### A. Claim One: *Brady* violations

The rule established in *Brady v. Maryland*, 373 U.S. 83 (1963), requires the prosecution to disclose materially exculpatory evidence in its possession to the defense. A *Brady* violation occurs when: 1) evidence is favorable to the accused because it is exculpatory or impeaching; 2) the evidence is not disclosed by the prosecution; 3) the nondisclosure results in prejudice to the accused. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### 1. Background

McGarvey claims that four separate *Brady* violations occurred when the State failed to disclose: 1) Susan Fox's letter of August 2, 2003, and the transcript of her testimony at Armstrong's sentencing; 2) Armstrong's jail notes; 3) information detailing Edwardson and Monroe's methamphetamine manufacturing; 4) information regarding the scope of Sanchez's drug dealing, his propensity for violence, his possession of multiple firearms, and information pertaining to his drug debt collection methods.

### 2. The State Court Decision

The Montana Supreme Court began its *Brady* analysis as follows:

> A party seeking to establish a Brady violation must establish that:
>
> 1)The State possessed evidence, including impeachment evidence, favorable to the defense; 2) the petitioner did not possess the evidence nor could have obtained it with reasonable diligence; 3) the prosecution suppressed the favorable evidence; and 4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been difference. *Gollehon v. State*, 1999 MT 210, ¶ 15, 296 Mont. 6, 986 P. 2d 395. *See also State v. St. Dennis*, 2010 MT 229, ¶ 47, 358 Mont. 88, 244 P. 3d 292 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999)).

*McGarvey v. State*, No. DA 13-0062, 2014 MT 189, ¶ 16 (Mont. July 15, 2014).

What is striking about this passage, is that the Montana Supreme Court has inserted an extra step, step 2 regarding diligence, into the *Brady* analysis. A review of the *Gollehon* case informs that this addition was made following a

citation to an Eleventh Circuit case: *Mills v. Singletary*, 63 F. 3d 999, 1014 (11th Cir. 1995). McGarvey argues that "[t]he Opinion of the Montana Supreme Court is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States because it adds a fourth element to the *Brady* analysis by requiring the defense to recognize reasonable diligence in locating suppressed evidence." (Doc. 6 at 29). Conversely, the State argues that "the reasonable diligence analysis is not an additional fourth element to the *Strickler* test, but is simply a part of the determination of the second element of the that [sic] test, *i.e.*, whether the evidence was suppressed by the state." (Doc. 11 at 27).

McGarvey points out that the Montana Supreme Court has recently recognized that requiring defense counsel to exercise "reasonable diligence" in locating exculpatory *Brady* material is contrary to Ninth Circuit law. See, *State v. Weisbarth*, 2016 MT 214, ¶ 30; see also, (Doc. 19). Because the Montana Supreme Court primarily relied upon the diligence prong of this modified *Brady* test in denying McGarvey's first claim pertaining to Susan Fox's letter and testimony, the reasonableness of that decision is discussed in greater detail below.

The Montana Court analyzed Armstrong's prison notes and Fox's testimony together. Ultimately, the Court affirmed the district court's conclusion that no *Brady* violation had occurred. *McGarvey*, 2014 MT 189, ¶ 19. The Court found

that both parties were put on notice that this evidence existed and the defense could have discovered it with reasonable diligence. *Id.*, at ¶ 18. The defense was put on constructive notice of the sentencing transcripts and would have discovered Fox's testimony if they had obtained them. Because the defense knew of the change of plea hearing, they would have known of the sentencing hearing and the information contained therein regarding Armstrong's character and prior crimes. *Id.*

The Court went on to state that even if the defense had been "blinded" to this information, it was "wholly contrary" to the defense strategy. *Id.* at ¶ 19. The defense strategy was to paint Armstrong as a liar; a snitch; motivated to extort money from McGarvey, recover money in the form of the crime stopper reward, and sought leniency on his own criminal charges. *Id.* The withheld evidence would have presented Armstrong as "forgetful, irrational, delusional, and unable to handle even minor stress." *Id.* The Court found this evidence could have been confusing to the jury and concluded it did not have a reasonable probability of influencing the outcome because the evidence would have "bolstered a theory that the defense strategically chose to avoid." *Id.*

McGarvey's next argument that the state failed to disclose impeachment evidence relating to Monroe's relationship to Edwardson and their methamphetamine production, did not persuade the Court. *Id.* at ¶ 20. The Court

found the trial court's conclusion that Edwardson had not produced methamphetamine with Monroe until after Edwardson had come forward regarding McGarvey's confession was supported by substantial evidence and was, therefore, irrelevant. *Id.* It was established Edwardson came forward with his information regarding McGarvey in January of 2002; the drug production took place in July of 2002 with Edwardson's girlfriend purchasing methamphetamine precursors in the spring of 2002. *Id.* McGarvey's speculation regarding this relationship was insufficient to warrant relief or establish that a *Brady* violation had occurred. *Id.*

In relation to the Leptich interview and the Matts police report, the Court found the information was irrelevant to the trial and did not affect the outcome. *Id.* at ¶ 21. Additionally, the Court found that at the time of trial the State was unaware of this information. *Id.* The Court reasoned that Leptich's beliefs and "gut feeling" about Sanchez were unsupported by any evidence and she had no personal knowledge of a connection between Sanchez and the murders. *Id.* While the Court found Leptich's statements would likely have been inadmissible, it concluded that in view of the evidence the defense actually did present, the statements lacked any real value and would have only "added speculation to hard evidence." *Id.* Included in this "hard evidence" was the fact Sanchez: owned a car some identified as the killer's car, had been at the crime scene delivering drugs on the day of the homicides, was owed money by Grant, had called Grant on the day

of the homicides, and had lied to investigators. *Id.* The defense effectively established that Sanchez had a propensity for violence and was selling drugs. *Id.*

The Court also affirmed the trial court finding that the Leptich and Matts evidence had not been intentionally suppressed. *Id.* at ¶ 22. The Court emphasized that McGarvey had failed to establish the State knew of this information prior to trial and that neither the State nor the investigators were "obligated to discover and disclose evidence obtained by another uninvolved jurisdiction. *Id.*, citing *U.S. v. Morris*, 80 F. 3d 1151, 1169 (7th Cir. 1996). The Court went on to find that "only a deliberate or intentional suppression of exculpatory evidence is a per se violation of due process under *Brady*" and that negligent suppression only becomes a *Brady* violation when the information is "material and of substantial use, vital to the defense, and exculpatory." *Id.*

The Court also found no fault on the part of investigators for not pursuing information or leads pertaining to Sanchez. "[P]olice officers are not required to take initiative or even assist the defendant with procuring evidence on his own behalf." *Id.*, citing *State v. Seiffert*, 2010 MT 169, ¶ 15, 357 Mont. 188, 237 P. 3d 669. The Court found this especially to be true in McGarvey's case because further investigation into Sanchez would have been based on the speculative information provided by Matts and Leptich. *Id.* McGarvey failed to establish the requisite elements of a *Brady* violation during his post-conviction proceedings. *Id.*

28

### 3. Analysis

In *Brady*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. at 87. The duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107 (1976), and the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). The rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.*, at 438. In order to comply with *Brady* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437. The three essential elements of a *Brady* claim are: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 262, 281-282 (1999).

Evidence is material under *Brady* if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "probability sufficient to undermine confidence in the outcome." *Id*. In assessing the issue of materiality, the court must review the trial record and decide whether it remains confident that the outcome would be the same even if the jury heard the suppressed evidence. See, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). If consideration of the additional evidence shakes the court's confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction. See *Strickler*, 527 U.S. at 290 ("The materiality inquiry is not just a matter of determining whether … the remaining evidence is sufficient to support the jury's conclusions."); *United States v. Agurs*, 427 U.S. 97, 112 (1976) ([T]he omission must be evaluated in the context of the entire record.").

### i. Brady Claims 2, 3, and 4- AEDPA Review

McGarvey has failed to establish that the Montana Supreme Court erred in a manner that would defeat the deference to be given to their decision under the

AEDPA. As to these three claims, McGarvey has not established that the Montana Supreme Court's decisions either resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented pursuant to 18 U.S.C. §§ 2254(d)(1) and (d)(2).

### a. Armstrong's Jail notes

As to Armstrong's jail notes there was no *Brady* violation. Although defense counsel testified at the post conviction relief hearing that the notes could have been helpful and triggered more inquiry on cross examination, these notes were not suppressed. The state represented to defense counsel that it was their belief the notes contained nothing exculpatory. Although McGarvey's counsel testified at the postconviction hearing that he had no independent recollection of whether or not they had received and reviewed the notes, the trial record reveals that the County Attorney made this information available to McGarvey prior to the start of trial.[6] Because there was no suppression, the Montana Supreme Court did not err in concluding there was no *Brady* violation relative to the notes.

//

---

[6]

| Prosecutor: | And we have those notes downstairs if you want to look at them, too. |
| Mr. Jackson: | Oh, Armstrong's? |
| Prosecutor: | Uh-huh. |
| Mr. Jackson: | Yeah, we'll—maybe we'll do that on break. |

(Doc. 10-3 at 42: 14-20).

### b. Edwardson and Monroe's Relationship

With respect to the relationship between Edwardson and Monroe, there likewise was no *Brady* violation. If it is true that Monroe had somehow coerced or threatened Edwardson to change his story, this information may have been helpful to McGarvey. But the record is silent as to proof of this arrangement. Certainly, it is suspicious that Edwardson, after initially denying any knowledge of the confession, subsequently changed his story to say he heard the confession and remembered both Monroe and Armstrong being present. During relatively the same time period, while being questioned about his prior statement, Armstrong changed his version to include that Monroe may have also been there. Armstrong was in custody in Nevada when the alteration to his story was made. There is no evidence that Armstrong colluded with Edwardson or Monroe to change his story. Evidence was also presented that Edwardson decided to tell the investigators what he knew after being convinced to do so by his sister. He didn't deny that Monroe wanted some "benefit" for being a potential witness to the confession and those facts came into evidence at trial.

Edwardson gave a written statement to law enforcement on August 8, 2002, but he did not indicate that he had been previously involved with Monroe in any criminal enterprise and he did not indicate Monroe blackmailed him. (Doc. 10-22 at 37-38). The charging documents allege that Monroe and Edwardson's unlawful

activity occurred between July 8, 2002 and August 8, 2002. (Doc. 10-22 at 13- 16). There was no evidence presented that Monroe had actually blackmailed or coerced Edwardson. When he was interviewed, Monroe refused to testify at McGarvey's trial. (Doc. 10-24 at 271).

There was no testimony or evidence presented during the post conviction proceedings that indicated Monroe threatened or coerced Edwardson with this alleged knowledge of joint criminal activity. None of the investigative materials showed that Monroe or Edwardson were involved in methamphetamine production prior to January of 2002, when Edwardson gave his statement regarding McGarvey's confession to law enforcement. It is mere supposition to think there was something more to their relationship. Importantly, because there is no indication the State knew of some threat or nefarious plot between Edwardson and Monroe there was nothing to be suppressed. The Montana Supreme Court did not err in its decision on this claim.

### c. Mary Leptich Information

Finally, in relation to the Sanchez and Leptich information regarding the scope of Sanchez's drug dealing there is no clear indication the State had this information and failed to disclose it. There is nothing in the record to show that Flathead County possessed any of the documents possessed by Lake County, the Northwest Task Force, or the Tribal authorities. While defense counsel testified at

the postconviction hearing that having this information would have been helpful and would have opened up additional avenues of investigation, particularly if they would have been able to establish that Sanchez was violent in collecting drug debts, it remains undisputed that Mary Leptich had no firsthand knowledge of Sanchez being involved in the Grant/Nelson homicides. Nor did she have firsthand knowledge of Sanchez being responsible for the beating of Salois; she just suspected Sanchez. See, (Doc. 10-24 at 249). Sanchez was never charged in conjunction with the Salois assault and he denied any involvement. *Id.* at 270-80. Additionally, Leptich had no firsthand knowledge that Sanchez was dealing drugs with Grant. *Id.* at 250. In relation to the homicides and Sanchez's potential involvement, Leptich simply had a "gut instinct." *Id.* at 251.

Furthermore, the manner in which McGarvey's postconviction investigator came to learn of Leptich required no privileged information. He simply accessed Sanchez's 2002 criminal file from Lake County which was available to the public. When he observed Leptich's name, he made contact with her. There was nothing that would have prevented McGarvey from procuring this information prior to his trial in 2003.

Because McGarvey has not shown that the information was ever possessed by Flathead County, he cannot establish that it was suppressed in violation of *Brady*. See *Benn v. Lambert*, 283 F. 3d 1040, 1061 (9th Cir. 2002). The Montana

Supreme Court should be accorded deference.

### ii.    Brady Claim 1 – AEDPA Review

As set forth above, and as the state concedes in its brief, "there are three components of a true *Brady* violation." (Doc. 11 at 22), citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). No United States Supreme Court case has required the diligence step that the Montana Supreme Court injected into the *Brady* analysis in McGarvey's case. But, as noted, there are other jurisdictions, including the Eleventh Circuit, that have explicitly inserted this step. Notwithstanding, the State contends because the Susan Fox letter was not suppressed, in essence the Court's injection of the diligence test matters not because it could have been discovered with reasonable diligence by the defense.

In support of its position, the State cites several federal appellate court decisions, including *United States v. Aichele*, 941 F. 2d 761, 764 (9th Cir. 1991). *Aichele*, however, does not exactly stand for the premise which the state posits: that failure of defense counsel to exercise diligence obviates a potential *Brady* claim of suppression. The question in *Aichele* turned on the duty of a United States Attorney to disclose a California State Department of Corrections file under the exclusive control of California state officials. The government had provided the defense with a transcript of an interview of a crucial government witness and the witness' rap sheet, but had not supplied prison records. *Aichele*, 941 F. 2d at

764. The Circuit held that because the AUSA had no control over the state's files, there was no *Brady* violation and that the "defendant ha[d] enough information to be able to ascertain the supposed *Brady* material on his own." *Id.* The Circuit has since clarified *Aichele*, stating that it stands for the premise that the federal government's *Brady* obligation does not extend to "files that were under the exclusive control of [state] officials." *Benn v. Lambert*, 283 F. 3d 1040, 1061 (9th Cir. 2002).

In *Amado v. Gonzalez*, the Circuit discussed several of its decisions that the Respondents there believed to stand for the proposition that a defendant must exercise due diligence. *Amado v. Gonzalez*, 758 F. 3d 1119, 1137 (9th Cir. 2014). The Circuit held that these cases establish only that "defense counsel cannot ignore that which is given to him or of which he otherwise is aware, and not that he is obliged to conduct interviews or investigations himself." *Id.* The Circuit held that such a requirement would flip the prosecutions duty of disclosure on its head and, ultimately, held that the Court of Appeals requirement of due diligence involved an unreasonable application of clearly established federal law under 28 U.S.C. §2254(d). *Id.* at 1136-7.

While McGarvey and defense counsel were certainly put on notice that Armstrong was going to be sentenced and that potentially incriminating evidence about Armstrong might be revealed, they were not put on notice that Susan Fox

would be testifying at Armstrong's sentencing hearing. Furthermore, the State was provided with and, thus possessed, a written letter documenting material that could be potentially used to impeach both Armstrong and Fox. While this Court does not necessarily agree that for purposes of *Brady* analysis the state "possessed" the testimony Fox provided at the hearing, it is undisputed that neither the transcript of the hearing or a copy of the letter, was provided to McGarvey prior to trial. To be sure Fox's letter was not disclosed. The Montana Supreme Court's decision that it was not suppressed because McGarvey failed to exercise diligence was unreasonable or contrary to *Brady*. Based on this finding, the Court will independently review the merits of McGarvey's claim.

### a. De Novo Review of *Brady* Claim

As set forth above, McGarvey has established the Fox letter and testimony could have been used as impeachment material, thus, the first component of a *Brady* violation has been met. *Brady*, of course, encompasses impeachment evidence; evidence that would impeach a central prosecution witness is favorable to the accused. *U.S. v. Price*, 566 F. 3d 900, 907 (9th Cir. 2009) citing, *Giglio v. United States*, 405 U.S. 150, 154 (1972). In analyzing suppression, "withholding" and "failure to disclose" have the same meaning. *Benn v. Lambert*, 283 F. 3d 1040, 1053 (9th Cir. 2002). Suppression does not refer only to purposeful acts, "sins of omission are equally within *Brady's* scope." *Price*, 566 F.

3d at 907. In the instant case, there has been no indication the State maliciously withheld the Fox letter; however, it was not disclosed and, therefore, for *Brady* purposes was suppressed. Consequently, the Court must consider whether or not prejudice ensued as a result of this nondisclosure.

The determination of whether nondisclosure of evidence resulted in an unfair trial turns on the question of whether the evidence was "material" to a defendant's case. Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "probability sufficient to undermine confidence in the outcome." *Id*. The court must review the trial record and decide whether it remains confident that the outcome would be the same even if the jury heard the suppressed evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). If consideration of the additional evidence shakes the court's confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction. *See Strickler*, 527 U.S. at 290.

In relation to the prejudice/materiality requirement, McGarvey contends the

Fox letter would have established either "Armstrong's incompetence or his, and his mother's, willingness to misrepresent to accomplish their goals." (Doc. 18 at 8). When Fox wrote the subject letter to Judge Lympus, she believed that Armstrong was being sentenced for felony bail jumping, when in reality he was being sentenced for felony theft. At the beginning of the letter, she copied the title of an article written and published in a Neurology Journal:

> "SURVIVORS EXPERIENCE A REDUCED CAPACITY TO FUNCTION, BOTH OCCUPATIONALLY AND SOCIALLY AND MAY COMPLAIN OF FORGETFULNESS, INEFFICIENCY AND INABILITY TO HANDLE EVEN MILDLY STRESSFUL SITUATIONS."

(Doc. 20-21 at 64)(emphasis in original). Fox states in the letter her belief that Armstrong suffers from neuropsychological damage caused by electrocution. *Id.* Fox discusses this "neuropsychological injury" as a mitigating circumstance which the judge should consider:

> [Armstrong] is being sentenced for felony bail jumping. The facts are that he forgot his court date. He called his attorney an hour or two after the hour he was supposed to appear. His attorney never contacted the court with this information. Not surprisingly, this attorney subsequently withdrew as counsel. My point is that [Armstrong] is being treated as a capable adult with normal mental capacity and he is not. His actions fit the classical pattern of an electrocution victim- Forgetfulness and then an inability to handle even mildly stressful situations, i.e.- Fleeing after a mix-up on a court date.

*Id.*

Fox was apparently called to testify in support of Armstrong's request for leniency from the sentencing court. When asked on direct examination what

changes Fox had observed in Armstrong since the 1993 electrocution, she stated:
"the ability to cope with stress, his forgetfulness, sleep pattern, he has a hard time
sleeping, memory stuff, confusion." (Doc. 10-21 at 33). But, no objective medical
evidence was presented to substantiate Fox's belief of a neuropsychological injury,
just her opinion gleaned primarily from her own online research. Fox explained
she believed Armstrong exhibited similar symptoms to others that had been
electrocuted including: confusion, short-term memory, trouble putting thoughts
together, and impulsivity. *Id.* at 34. Fox then recommended what sentence the
trial judge should impose- including psychiatric counseling, treatment for his
alcoholism, and assistance with gaining structure in his life.

On cross examination, the following exchange occurred:

Q: And you do realize that Robert is not being sentenced, nor was he
convicted of bail jumping in this case.

A: Right.

Q: Just for—

A: But it kind of escalated. He forgot his appointment, he thought it was
a Friday, so he called Thursday afternoon, he showed up, they said no,
your case is this morning, so he called his attorney and we - - I dialed
the attorney up and stood next to him when he called.

Q: We're not here on the bail jumping, we're here on the theft.

A: I'm saying he got stressed and he took off and –

Q: Okay.

A:    -- basically for no real good reason.

*Id*. at 37-38.  There was also significant testimony presented at sentencing

concerning Armstrong's extensive alcohol use spanning twenty years (*id*. at 36),

that his issues weren't just a result of the electrocution, (*id*.), that he had a history

of significant drug use (*id*. at 36-37), and that he had significant and ongoing legal

trouble, including felonies, which predated the electrocution (*id*. at 37; 39).  The

overriding issue established at Armstrong's sentencing was that he was an

alcoholic and needed treatment.  "The mere possibility that an item of undisclosed

information might have helped the defense, or might have affected the outcome of

the trial, does not establish 'materiality' in the constitutional sense." *Barker v.

Fleming*, 423 F. 3d 1085, 1099 (9th Cir. 2005), quoting *United States v. Croft*, 124

F. 3d 1109, 1124 (9th Cir. 1997).

In McGarvey's prosecution, the jury had ample reason to question

Armstrong's story, credibility, and motive to lie.  During the post-conviction

hearing, defense counsel revealed that their strategy was to portray Armstrong as a

liar, thief, extortionist, and drunk.  (Doc. 10-25 at 105).  From a review of the

record, they were able to effectively do just that.  While "impeachment evidence is

especially likely to be material when it impugns the testimony of a witness who is

critical to the prosecution's case," *Silva v. Brown*, 416 F. 3d 980, 987 (9th Cir.

2005), in the instant case, defense counsel was able to effectively challenge

41

Armstrong's testimony throughout its cross examination. Knowing that Armstrong was an alcoholic and that he was "half lit" when he heard McGarvey's confession, the jury had ample reason to question Armstrong's memory. The jury's knowledge of Armstrong's legal troubles and the fact that he did not disclose the details of the confession until it became advantageous for him to do so, gave the jury plenty of reason to question Armstrong's motive and truthfulness.

None of the investigators nor attorneys involved in the case seemed to believe that Armstrong had memory difficulties. Even though he offered varying accounts of who was present for McGarvey's confession- the core facts of his story remained the same: McGarvey told him that he and Grant were in a verbal altercation outside Grant's trailer, that Grant shot at him, that McGarvey wrested the gun away from Grant and shot Grant while he was on the ground, and McGarvey then shot Nelson as he fled toward a vehicle. None of these details were contradicted by physical evidence from the crime scene. These core details persisted over a long period of time. Moreover, this account coincided with what was initially disclosed to Fox, which is what prompted her to make the tip to law enforcement in July of 2001. The general details also matched up with Edwardson's disclosure which was corroborated by Edwardson's sister's acknowledgment that he sought advice from her regarding going to law enforcement with the information he had surrounding the confession.

While knowledge of Fox's letter may have given defense counsel an additional avenue to potentially challenge the testimony of Fox and Armstrong, it is not likely that this information would have affected the trial in such a way as to create a reasonable probability of a different result at trial. Nor has confidence in the outcome been undermined. See *Bagley,* 473 U.S. at 682; see also, *Kyles v. Whitley,* 514 U.S. 419, 434; *United States v. Kennedy,* 890 F.2d 1056, 1058-59 (9th Cir.1989). No *Brady* violation occurred.

## B. Claim Two: Ineffective Assistance of Trial Counsel

### 1. Background

McGarvey claims his trial counsel was ineffective for: 1) failing to use available impeachment material, 2) failing to call Kelsey Nichols and Gena McGarvey as witnesses at trial, 3) failing to hire a forensic expert, and, 4) failing to adequately investigate the case.

### 2. The State Court Decision

#### a. Impeachment evidence

McGarvey takes issue with his defense team's decision not to cross-examine Armstrong about who exactly was present during McGarvey's confession. *McGarvey v. State*, 2014 MT 189, ¶ 27. Armstrong's account of this event undoubtedly shifted several times over the course of the investigation and trial, with Armstrong's various statements as to who was present being inconsistent with

Edwardson's statements. The Montana Supreme Court noted the defense team's decision in this regard was a tactical one- they did not want it to be known that Gena McGarvey may have been present during the confession. *Id*. In particular, the defense team did not want the spontaneous statement from Gena, "holy shit, he really did it" before the jury. *Id*. And they had grave concerns about her ability to withstand cross-examination. *Id*.

In this same vein, the Montana Supreme Court found the defense team had made a reasonable strategic decision in not examining Armstrong closely on the details of the shooting that he may have learned from news accounts. *Id*. at ¶ 28. The Court emphasized that by focusing on such testimony other details, including: that McGarvey shot Grant in the head while Grant was lying on the ground, that Grant suffered gunshot wounds from a close range, that McGarvey allegedly confessed to shooting Nelson because he believed Nelson was running to retrieve his shotgun, that the investigation revealed that Nelson had a reputation from carrying a shotgun with a flashlight attached to it, and that Nelson was shot from a greater distance than Grant, could have served to "cement Armstrong's credibility and hamstring the defense narrative that he was a liar." *Id*.

McGarvey also argued that the defense team should have cross examined Fox more closely about her motivation for making the initial anonymous call to law enforcement that implicated McGarvey. The Court rejected this argument

concluding the defense team acted reasonably in deciding that the inconsistencies were "of little or no significance." *Id.* at ¶ 29. The Court explained that whether Fox made the call to shield her son from involvement, or because her son was too upset to make the call were not mutually exclusive reasons. Under either scenario, Fox was trying to shield her son- from implication in the investigation or from facing criminal charges. The Court found that the defense attacked Fox's credibility by establishing that she initially lied about making the call, that she intentionally gave misleading information, and that she sought to prevent law enforcement from investigating her son. *Id.* The Court found that exploring an additional minor inconsistency would have added little to the overall defense case. *Id.*

Finally, McGarvey argued his defense counsel did not adequately examine Edwardson regarding his inconsistent statements and his shifting story of whether or not Monroe was present for the confession. *Id.* at ¶ 30. The Court found that on cross, defense counsel was able to establish: 1) that Monroe had asked Edwardson to tell law enforcement that he (Monroe) had been present for the confession; 2) that Edwardson had lied and had "consistently tried to mislead law enforcement;" and, 3) that Edwardson was on bad terms with McGarvey at the time he gave the statement implicating McGarvey. *Id.* The Court also noted there was no evidence to support McGarvey's theory that Edwardson and Monroe had colluded to

fabricate the confession or that Edwardson had been forced to relay the story of the confession to law enforcement. *Id.* The Court concluded the defense team's strategic decision to limit the scope of the cross examination of Edwardson was entirely reasonable and did not constitute ineffective assistance of counsel. *Id.*

### b. Forensic Experts

The defense team did not hire a forensic expert because they determined they would be able to effectively establish the testimony they needed via cross examination of the state's forensic experts. *Id.* at 31. Of particular importance is the evidence pertaining to whether Grant's face was mangled by a dog rather than cut by a knife. The Court explained that while the state's expert was able to discredit the knife theory at the post-conviction hearing, presentation of this theory at trial could have damaged the overall credibility of the defense. *Id.* Accordingly, the Court found the defense team's election not to involve an expert was a reasonable strategic decision. *Id.*

### c. Gena McGarvey and Kelsey Nichols

The defense team decided not to call McGarvey's wife, Gena, or step-son Kelsey Nichols, as witnesses at trial. *Id.* at ¶ 33. As previously noted, the team determined after discussion with McGarvey, that Gena's testimony could be harmful to the defense. *Id.* As to the then-juvenile, Nichols, he had fled Montana to avoid arrest on outstanding warrants and refused to return to testify. *Id.*

Importantly, counsel determined that Nichol's testimony had little value, because he could only testify that he didn't hear the confession. *Id.* The Court found that it was an entirely reasonable defense tactic to "weed out, harmful, confusing, or unnecessary testimony." *Id.*

### d. Investigation of Undisclosed Evidence/Witnesses

Lastly, McGarvey argued that his defense team should have conducted an investigation into the evidence that the state failed to disclose. The Court held that discovery and presentation of this evidence would not have produced a different outcome at trial, as each piece was "dubiously related" and served only to "impeach witnesses who had already been thoroughly impeached." *Id.* at ¶ 34.

In relation to the testimony of Buck, Gifford, and Hulford, the trial court found that the testimony from Gifford and Hulford was hearsay and could not have been admitted at trial. *Id.* at ¶ 32. Also, the testimony of Buck would have confirmed that Armstrong learned of the homicides from McGarvey, which was the very fact that the defense was directly trying to disprove. *Id.* The Court held that even if defense counsel was deficient in not procuring the testimony of these individuals or exercising reasonable professional conduct in the investigation, the failure did not prejudice McGarvey because had the evidence been presented, there was not a reasonable probability of a different outcome. *Id.* at ¶¶ 32, 34.

### 3. Clearly Established Federal Law

The Sixth Amendment guarantees the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U. S. 668 (1984). When a petitioner claims that his counsel's performance violated the Sixth Amendment, "[i]n addition to the deference granted to the state court's decision under AEDPA, [federal habeas courts] review ineffective assistance of counsel claims in the deferential light of *Strickland*." *Brown v. Ornoski*, 503 F. 3d 1006, 1011 (9th Cir. 2007); see also *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (review of a *Strickland* claim pursuant to Section 2254(d)(1) is "doubly deferential").

To prevail on an ineffective assistance of trial claim under *Strickland*, a petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Both prongs of the *Strickland* test must be satisfied to establish a constitutional violation; failure to satisfy either prong requires that an ineffective assistance claim be denied. *Strickland*, at 697 (no need to address deficiency of performance if prejudice is examined first and found lacking); *Rios v. Rocha*, 299 F. 3d 796, 805 (9th Cir. 2002)("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

To satisfy the deficient performance prong, the petitioner must prove counsel's performance was so deficient that it "fell below an objective standard of

reasonableness." *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance "must be highly deferential," and a court must guard against the distorting effects of hindsight and evaluate the challenged conduct from counsel's perspective at the time in issue. *Id*. at 689; see also *Mirzayance*, 129 S. Ct. at 1420 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms")(citations omitted); *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)(per curiam)(noting that even inadvertent, as opposed to tactical, attorney omissions do not automatically guarantee habeas relief, because "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (the first *Strickland* prong is a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time"). The Supreme Court has advised lower courts to "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance..." *Strickland* at 689.

To satisfy the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Richter*,

131 S. Ct. at 792. "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

Finally, even if the petitioner can satisfy both prongs, the AEDPA requires a reviewing court find the state court's contrary conclusions are objectively unreasonable before granting habeas relief. *Schriro v. Landraigan*, 550 U.S. 465, 473 (2007); *see also Richter*, 131 S. Ct. at 785 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard."). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.*, at 788.

### 4. Analysis- AEDPA review

McGarvey has not established that the Montana Supreme Court unreasonably applied the *Strickland* test in his case. Given the high level of deference due, it cannot be said the Montana Supreme Court's denial of McGarvey's ineffective assistance of counsel claims was contrary to or an unreasonable application of *Strickland*.

//

50

### a. Impeachment Evidence

McGarvey contends his attorney Vernay's unfamiliarity with the discovery in this case left Vernay with a "fundamental misunderstanding of the facts of the case." (Doc. 6 at 53). He bases this contention primarily upon Vernay's testimony in the post-conviction hearing- a hearing which occurred some seven years after the trial. He argues here, as he did in the state court, that the defense team was ineffective in not more thoroughly cross-examining Armstrong, Edwardson, and Fox.

### i. Cross Examination of Armstrong

In McGarvey's view, Armstrong should have been questioned extensively about his inconsistent accounts of McGarvey's confession and shifting cast of individuals who were present. This, according to McGarvey, would have been the most effective way to discredit Armstrong's testimony about the all-important confession. Thus, he asserts the Montana Supreme Court's decision that the defense team's decision not to pursue this line of inquiry was strategic is unreasonable.

At the post-conviction hearing, Vernay explained his approach to cross-examination of Armstrong and what he hoped to glean from the examination. Vernay acknowledged that he was aware of the inconsistencies in Armstrong's statements, but stated he conducted the cross-examination with a clear plan- a

strategy designed to undermine Armstrong's credibility. (Doc. 10-25 at 15). The defense team was able to do so by establishing: (1) Armstrong attempted to claim the crime stopper's reward money (*id*. at 9); (2) Armstrong gave inconsistent stories about what had occurred (*id*.); (3) Armstrong lied (*id*.); (4) Armstrong absconded (*id*.); (5) Armstrong attempted to blackmail McGarvey (*id*. at 10); (6) Armstrong did not tell law enforcement about McGarvey's confession until he was in significant legal trouble of his own (*id*. at 10-11); (7) Armstrong couldn't remember what day McGarvey confessed (*id*. at 11); and, (8) Armstrong was intoxicated when McGarvey confessed to him (*id*. at 12). Vernay explained his belief that it would have been counterproductive to spend significant time going into each inconsistency and that that approach didn't match with his cross-examination style. *Id*. at 16.

Contrary to McGarvey's assertion, Vernay mounted a vigorous and through cross examination based upon the referenced information. The Montana Supreme Court's decision in this regard was not unreasonable.

### ii.     Cross Examination of Edwardson

McGarvey likewise asserts the defense team was ineffective in failing to also examine Edwardson about the inconsistencies in his story relating to who was present for the confession. According to McGarvey, the evidence suggested that Monroe had "something" on Edwardson which Vernay should have pursued on

cross-examination. But as noted above, there was nothing in the record to indicate that Edwardson and Monroe were manufacturing methamphetamine together at the time Edwardson came forward with his account of McGarvey's confession in January of 2002. Neither Edwardson nor Monroe was charged in conjunction with operating a clandestine lab until the summer of 2002, months after Edwardson's second interview. The Montana Supreme Court's conclusion the defense team's decision to "limit their cross examination to the facts of the case rather than resorting to speculation unsupported by evidence" was a reasonable one.

### iii.    Cross Examination of Fox

As he argued in state court, McGarvey argues here that Fox should have been grilled on the various reasons she gave for making the anonymous tip to law enforcement. As the trial court observed, however, "[t]he jury was made aware of her reason for the call and that she initially lied to investigators." (Doc. 10-26 at 3, ¶18). The defense team was able to attack Fox's credibility by showing not only that she lied about being the anonymous tipster, but also that she had "intentionally given misleading information in the tip and that she had wanted to prevent police from investigating Armstrong." *See McGarvey v. State*, 2014 MT 189, ¶ 29. The record reveals that a theme of Fox seeking to protect her son was adequately established by the defense team. The Montana Supreme Court's decision in this regard should be afforded deference.

### iv.  Questioning Related to Newspaper Accounts

Vernay testified that there were three facts known to Armstrong and Edwardson that were not contained in news reports: 1) Grant was likely shot with a .357; 2) McGarvey was by the door with Grant when the altercation and shooting occurred, and 3) McGarvey got the gun and shot Grant while he was lying on his back. (Doc. 10-25 at 134-5). There was additional testimony about evidence developed during the trial that Nelson was known to carry a shotgun with a flashlight taped to it and that Armstrong was somehow aware of this habit. (Doc. 10-24 at 214).

The post-conviction testimony of Detective Parrish supports these findings. Detective Parrish testified that part of what made Armstrong's account of the confession believable was that his description matched what others had disclosed in regard to Grant's behavior towards other individuals on his property. (Doc. 10-25 at 187).  Parish testified that Armstrong stated that one of the rounds was fired into the back of Grant's neck and this information was not in any news article. *Id.* Likewise, Edwardson provided the same detail about a shot going into the back of Grant's head and that the altercation occurred in front of Grant's door. *Id.* 188. The detail of the shot in the back of the head/neck was unknown until the body was examined. Neither that detail nor the altercation occurring in front of the door was contained in any news article. *Id.*

Further, attorney Vernay testified that there was a specific reason that they did not focus attention on the newspaper articles and go "through, chapter and verse, the details of the crime" because there was no meaningful impeachment material to be gained and it would have brought the jury's attention to the details of the crime and McGarvey's involvement. (Doc. 10-25 at 122). The Montana Supreme Court's conclusion that the defense team made a reasonable strategic decision to forego any questioning relating to the newspaper accounts in relation to the details of McGarvey's confession was reasonable and should be accorded deference.

### v. Cross Examination of Detective Parish

McGarvey argues that following Detective Parish's testimony, law enforcement had no information Grant was dealing drugs, he should have been impeached with information to the contrary and that failure to do so left a false impression with the jury. In reality, what Detective Parish testified to is that he had gone to great lengths to follow the Mexican mafia leads and interviewed many individuals in the course of doing so. *See* Doc. 10-5 at 34. He also stated that while working with the drug team he never received any information that Grant was a meth dealer. *Id.* at 35.

This Court disagrees with McGarvey's contention the jury was left with a false impression that Grant was not involved in drug dealing. Significant

testimony was presented which illustrated to the jury that Grant was, in fact, involved in the Flathead Valley drug scene, including: (1) testimony that Armstrong discussed the possibility of returning to Grant's to recover drugs and money (doc. 10-4 at 284); (2) Sanchez admitted running drugs to Grant from Washington and that on the day of the homicides he had methamphetamine to deliver to Grant (*id*. at 149-150); (3) Sanchez continued to call Grant 17 times over the two days following the shooting in an effort to deliver methamphetamine to Grant (*id*. at 165-170); (4) Detective Myers testified that a medium-sized grow operation and drug paraphernalia were found inside Grant's trailer (Doc. 10-3 at 268; 282); also, (5) investigators discovered a second defunct grow operation on Grant's property. *Id*. at 281. McGarvey's claim regarding the false impression given to the jury is without merit. The Montana Supreme Court's conclusion on this issue was reasonable.

### vi. Examination Regarding Shifting Accounts of the Confession

Finally, McGarvey asserts that defense counsel should have questioned law enforcement about Armstrong and Edwardson's shifting story of the confession and their inclusion of Monroe as one of the individuals present for the confession. Also, McGarvey believes counsel should have challenged law enforcement on their failure to properly investigate Sanchez. McGarvey points out that the Montana Supreme Court did not directly address this claim. Even without an explicit

holding as to this portion of the ineffective assistance claim, the burden remains on McGarvey to establish "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.*

At trial Edwardson admitted he had included Monroe in part of the confession account during his second interview at Monroe's behest and that Monroe hoped to gain a benefit with his own legal troubles. Armstrong, somewhat reluctantly, stated that Monroe was present during the confession in one of his accounts. Monroe refused to testify at trial. As set forth above, no evidence of blackmailing or methamphetamine production between Monroe and Edwardson was established prior Edwardson's second statement to law enforcement. It was not ineffective for counsel to elect not to pursue this line of questioning with law enforcement.

In relation to Sanchez not being investigated, Sanchez himself testified during cross examination by McGarvey's counsel that one of the first things he was told by investigators during his interview was that they did not consider him to be a suspect and that investigators knew he didn't commit the homicides. (Doc. 10-4 at 196). Sanchez's recollection was then refreshed with a copy of his

interview and he acknowledged that on February 5, 2002, Detective Stahlberg told him that they believed McGarvey was responsible for the homicides. *Id*. at 197-98. Sanchez also conceded that he was not questioned about drugs during that interview nor was he asked by Detectives if he had been dealing drugs with Grant. *Id*. at 199.

As to both of these points, McGarvey has failed to establish there existed no reasonable basis for the state court to deny relief. Further, McGarvey has not demonstrated that the Montana Supreme Court unreasonably determined that counsel did not err failing to use available impeachment material.

### b. Forensic Expert

The Montana Supreme Court's determination that the defense properly declined to hire their own defense expert was not an unreasonable one. The defense determined that it wasn't necessary to hire their own independent expert, because they felt that they would be able to advance their theory of defense through the use of the state's own experts.

At the post-conviction hearing McGarvey presented the testimony of Kay Sweeny. Mr. Sweeny testified that the injuries Grant sustained to his face were more consistent with a knife, or being cut off, rather than being chewed off by dogs, as the State medical examiner testified. (Doc. 10-24 at 17-18). Mr. Sweeny also testified that the two bullets that passed through Grant came from different

58

directions. *Id.* at 31-32. Sweeny believed that two different shooters were involved in the deaths of Grant and Nelson. *Id.* at 45-6. Sweeny testified he believed a photograph of the scene depicted blood spatter on the inside of the vehicle in which Nelson was found and he had concerns that this blood was never analyzed. *Id.* at 34-5.

Sweeny did not participate in the autopsies of Grant or Nelson, nor did he have the opportunity to personally examine the bodies. *Id.* at 37-8. Sweeny is not a medical doctor or pathologist and has no formal training in pathology. *Id.*

The State's expert, William Schneck, testified that the dots on the window of the vehicle were not blood spatter, but rather water droplets, reflecting the dark fabric from the car interior. *Id.* at 59-61. The State Medical Examiner, Dr. Gary Dale, who performed the autopsies on both Grant and Nelson, testified that all of the sharp force injuries observed in the two bodies could be entirely explained as being the result of gunshot wounds or of the body part being ravaged by dogs and that there was "no reason to bring a knife" into the equation. *Id.* at 94.

The trial court found that Mr. Sweeny's testimony "in part supported the prosecution's theory that both victims were shot with a particular revolver and in other parts was not credible." (Doc. 10-26 at 4, ¶ 19). Here, McGarvey advances Sweeny's theory that Grant's face was cut off with a knife, rather than chewed or torn off by the pit bulls that had access to the body in the days following the

shootings, and that this type of violent behavior supports the theory of the Mexican mafia being responsible. McGarvey contends trial counsel's decision not to hire such an independent expert constituted ineffective assistance of counsel.

McGarvey points out that the state district court's finding was non-specific as to which portion of Sweeny's testimony it found not to be credible. The Montana Supreme Court, however, specifically addressed the very concern that McGarvey now raises regarding the knife versus the dog bite theory. The Court noted Dr. Dale, who examined the bodies, explained that the cutting signs were explained by the presence of dogs and that the "marks and tears were more consistent with a dog bite" than being cut. *McGarvey* at ¶ 31. Further, the Court noted that the defense was able to establish its theory regarding multiple shooters via the examination of Dr. Dale. Sweeny, in part, refuted this theory as found by the trial court.

"But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Sweeny's testimony could have helped to corroborate the Mexican Mafia theory, but that theory was not itself so strong that failure to present such testimony was unreasonable. On the whole, it is not reasonably probable that the jury would have retained reasonable doubt as to the State's theory. The defense made a strategic

60

decision regarding expert testimony and the Montana Supreme Court's finding on this issue was not an unreasonable one.

### c. Kelsey Nichols and Gena McGarvey

McGarvey also faults counsel for failing to call Kelsey Nichols and Gena McGarvey as witnesses. McGarvey maintains that both would have testified that they did not hear the confession. He then goes on to argue that calling them would have served to further highlight Armstrong's inconsistencies about who was present for the confession. As set forth above, however, the cross-examination of Armstrong was reasonable and based on a measured defense strategy.

Testimony established a solid basis for the defense choosing not to call Kelsey or Gena. Kelsey Nichols was unavailable for trial; he was on the run out of state and there were warrants out for his arrest. *See,* Doc. 10-24 at 109-10; 205-6. Even if Kelsey denied hearing the confession, at an interview before trial he acknowledged hearing McGarvey question Edwardson if Edwardson believed McGarvey to be "a nice guy." This would have corroborated a portion of Edwardson's description of the confession. *Id.* at 252. In this same interview, Kelsey also confirmed that McGarvey related to him that he was on the Grant property the day of the homicides and that he was down in front of the house conversing with the Sanchez and Lopez. Thus, Nichols' testimony also would have placed McGarvey down on the Grant property at the time he encountered the

Sanchez and Lopez; McGarvey had initially maintained that during this encounter he remained at the property gate. *Id.* at 252-3.

Counsel testified there were three distinct reasons that Gena did not testify: 1) in doing so she would have waived the marital privilege; 2) it would have brought in the potentially damaging statement from Armstrong that when she saw the news articles of the homicides she exclaimed, "Holy shit, he did do it!"; 3) she did not want to testify. (Doc. 10-25 at 90-91). Defense counsel testified that they had discussed this decision with McGarvey and Gena and both agreed Gena should not testify. Also, counsel believed she would have been a "terrible" witness due to her flat, dull affect and demeanor. (Doc. 10-24 at 206).

The Montana Supreme Court's finding that choosing to forego calling Gena or Kelsey was a reasonable trial tactic to "preserve the credibility of the defense and weed out unnecessary or confusion testimony" was reasonable. Kelsey was unavailable and the danger potentially posed by certain testimony from either could have been damaging to McGarvey's overall defense.

### d. Adequacy of Investigation

In relation to the defense team's investigation, while not holding that McGarvey had established the first prong of *Strickland*, the Montana Supreme Court determined that even if counsel had not exercised reasonable conduct, no prejudice had ensued. Therefore, McGarvey could not establish a reasonable

probability that the outcome of trial would have been different. *McGarvey*, at ¶ 34.

McGarvey argues that had the jury known the information provided by Joe Buck, that Armstrong told Buck he went to the Grant property after the homicides, this could have provided an explanation for Fox's motivation in making the crime stopper call. The problem with this argument, however, is that defense counsel actually spoke with Joe Buck prior to McGarvey's trial. During this conversation, Buck never mentioned having any conversation with Armstrong. (Doc. 10-24 at 270-71; 172). The focus of Buck's conversation with counsel related to information Buck had about trial tactics being used at that time by the Flathead County Attorney's Office. *Id.* at 270. Further, Mr. Buck testified that he shared the information relating to Armstrong with McGarvey (*id.* at 173), but apparently McGarvey never informed his counsel.

The testimony also revealed that Kenneth Gifford told Jason Atten that sometime during November or December of 2003 he was riding in a car with a Mexican American named "Junior" who told him that Grant was murdered over a drug debt. (Doc. 10-24 at 182-3). Junior wanted Gifford to go with him to the Grant property to retrieve money located in Grant's trailer. *Id.* at 183. Gifford then sent a letter to McGarvey with this information on March 15, 2004. Doc. 10-24 at 185; Doc. 10-18 at 59-60. While Gifford's conversation with Junior may or may not have occurred after McGarvey's trial, it is clear that the information he

had was not actually conveyed to McGarvey until months after the trial. Furthermore, it was not established that the "Junior" to which Gifford referred, was Sanchez's nephew, Arnoldo Lopez, who accompanied Sanchez to the Grant property on the day of the homicides.

Gene Holford testified that he had attempted to purchase a pit bull from Grant and when Grant refused to sell the puppy to Holford later returned to Grant's property with a mutual friend. (Doc. 10-24 at 239-40). Upon return, the two men encountered a neatly dressed man in an Audi parked in Grant's driveway. The man, who barely spoke English, stated that Grant wasn't around and he was waiting for him, apparently because Grant owed him $25,000. *Id.* at 241-42. It appears that this information was not discovered until work began on McGarvey's post-conviction petition.

This "evidence," in conjunction with the Leptich/Sanchez information discussed above, falls into three categories: further impeachment evidence of Armstrong, further impeachment evidence of Sanchez, and further support for the "Mexican mafia" theory. Defense counsel was not deficient for failing to obtain the Lake County and Drug Task Force information, in fact they had made discovery requests for this information but it apparently never made it into the hands of the Flathead County officials until the time of the postconviction proceedings. Likewise, this Court does not believe counsel's performance was

64

deficient in failing to obtain the information from Buck, Holford, or Gifford. Defense counsel actually spoke to Buck prior to trial, but he never shared the information he had pertaining to Armstrong. Also, McGarvey apparently was aware of Buck's knowledge, but he did not share this information with his defense team. Likewise, it appears that the information from Holford and Gifford was disclosed well after trial and there is no indication that defense counsel could have uncovered this information in a timely manner despite their efforts.

The Montana Supreme Court found that there was no prejudice from the failure to uncover this information as each "piece was dubiously relevant and served to impeach witnesses who had already been thoroughly impeached." *McGarvey*, 2014 MT 189, at ¶ 34. This was a reasonable finding and should be accorded deference.

There was no testimony presented that Sanchez was the neatly dressed man that Holford identified or that his nephew was the "Junior" that spoke to Gifford. The value and admissibility these two items is questionable, at best. Further, while the defense would certainly have attempted to use the information that Leptich had about Sanchez, there is no doubt that Sanchez was thoroughly impeached at trial. (*See e.g.,* Doc. 10-4 at 437-488; Doc. 10-24 at 256-64). Further, Leptich had no firsthand knowledge of Sanchez being involved in the homicides, being responsible for beating Barney Salois, or dealing drugs with Grant. (Doc. 10-24 at

248-9). She simply had a gut instinct. It is unlikely that this information would have added much more to bolster the "Mexican mafia" theory that the defense was able to advance at trial.

Finally, as to the information that Buck possessed about Armstrong allegedly returning to the crime scene, it is undisputed that Armstrong, like Sanchez, had been thoroughly impeached at trial. Also, the very fact that both Buck and McGarvey chose not to share this information with defense counsel casts suspicion on its veracity. In addition, the very nature of this information would tend to underscore the fact that Armstrong learned of the homicides from McGarvey which in and of itself could have been damaging to the defense. There was no reason to believe that any of this information was "sufficient to undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694.

### C. Claim Three: Cumulative Error

Because McGarvey is unable to establish a single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation. See *Mancuso v. Olivarez*, 292 F. 3d 939, 957 (9th Cir. 2002). The Montana Supreme Court's decision in this regard should be afforded deference.

### V.    Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254

Proceedings. A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

McGarvey has not made a substantial showing that he was deprived of a constitutional right. There are no close questions and there is no reason to encourage further proceedings. While McGarvey was able to establish the Montana Supreme Court's application of *Brady* to the non-disclosure of Fox's letter was unreasonable, upon this Court's de novo review, the claim fails. The rest of McGarvey's claims do not survive deferential review under the AEDPA. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The petition (Doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter, by separate document, a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. McGarvey may object to this Findings and Recommendation within 14

days.[7] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de

novo determination by the district judge and/or waive the right to appeal.

Mr. McGarvey must immediately notify the Court of any change in his

mailing address by filing a "Notice of Change of Address." Failure to do so may

result in dismissal of this action without notice to him.

DATED this 21st day of December, 2016.

Jeremiah C. Lynch
United States Magistrate Judge

---

[7] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.